## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHRISTINE BENNETT,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO. 1:06cv723-MHT** |
| **ARMY FLEET SUPPORT, LLC,** | § | |
| **Defendant.** | § | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT ARMY FLEET SUPPORT, LLC'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

KIRK C. SHAW
ARMBRECHT JACKSON LLP
POST OFFICE BOX 290
MOBILE, ALABAMA 36601
(251) 405-1300 - TELEPHONE
(251) 432-6843 - FACSIMILE

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………………….. ii

I.    PRELIMINARY STATEMENT  ………………………………………………….1

      A.    Nature of the Case  …………………………………………………………1

      B.    Proceedings to Date  ……………………………………………………….4

II.   STATEMENT OF UNDISPUTED FACTS  ……..………………………………4

III.  ARGUMENT AND AUTHORITIES …………………………………………….18

      A.    Standard for Summary Judgment  ………………………………………….18

      B.    There Is No Substantial Evidence That Defendant Is A
            "Recipient Of Federal Financial Assistance."  …………………………..20

      C.    Plaintiff Has Not Presented Substantial Evidence To Establish
            A *Prima Facie* Case of Gender Discrimination.  Therefore, AFS Is
            Due Summary Judgment on Plaintiff's Title VII Claim
            (Count Three)  ………………………………………………………….26

IV.   CONCLUSION  …………………………………………………………………..31

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510,
91 L. Ed.2d 202 (1986) ……………………………………………………18, 19

*Arline v. School Bd. of Nassau County,* 772 F.2d 759 (11th Cir. 1985)…….....…21, 26, 31

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 2552,
91 L. Ed. 2d 265 (1986)…………………………………………………………..19

*Chapman v. A1 Transport,* 229 F.3d 1012, 1026 (11th Cir. 2000)………………………18

*Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) ………………27

*DeVargas v. Mason & Hanger-Silas Mason Co.,* 911 F.2d 1377, 1382
(10th Cir. 1990)…………………………………………………………….21, 25, 26

*Herawi v. State of Alabama Department of Forensic Sciences,*
311 F. Supp. 2d 1335, 1339 (M.D. Ala. 2004) …………………………………18

*Jacobson v. Delta Airline,* 742 F.2d 1202, 1210 (9th Cir. 1984) ………………………..22

*Jones v. Alabama Power Co.,* 10 A.D.D. 1095,
3 A.D. Cas. (BNA) 1717, 1731 (1995) …………………………………..21, 26, 31

*Leskinen v. Utz Quality Foods, Inc.,* 30 F. Supp. 2d 530, 534 (D. Md. 1998) …….22, 23

*Malladi v. Brown,* 987 F. Supp. 893, 908-09 (M.D. Ala. 1997) …………………………27

*Mass v. Martin Marietta Corp.,* 805 F. Supp. 1530 (D. Col. 1992),   ………………24, 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586,
106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)…………………………………19

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817,
36 L. Ed.2d 668 (1973) …………………………………………………………..27

*Moore v. Sun Bank of Florida,* 923 F.2d 1421 (11th Cir. 1991)…………………………21

*Muller v. Hotsy Corp.,* 917 F. Supp. 1389 (N.D. Iowa 1996) …………………………..22

*Perryman v. First United Methodist Church,* 2007 WL 703604, pp. 4-5
　　(M.D. Ala. 2007) ……………………………………………………18, 27

*Raney v. Vinson Guard Service, Inc.,* 120 F.3d 1192, 1196 (11th Cir. 1997)……………19

*Squire v. United Airlines, Inc.,* 973 F. Supp. 1004, 1008 (D. Colo. 1997)………………22

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248,
　　101 S.Ct. 1089, 67 L. Ed.2d 207 (1981) …………………………………….27, 28

*Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990)…………………………………18

*Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1085 (11th Cir. 2004)……18, 27, 28, 29, 31

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHRISTINE BENNETT, | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 1:06cv723-MHT |
| ARMY FLEET SUPPORT, LLC, | § | |
| Defendant. | § | |

MEMORANDUM IN SUPPORT OF
DEFENDANT ARMY FLEET SUPPORT, LLC'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Army Fleet Support, LLC submits this memorandum in support of its

Motion for Partial Summary Judgment as to Counts Two and Three of Plaintiff's

Amended Complaint.[1]  For the reasons that follow and based on the authorities cited,

AFS's motion is due to be granted.

## I   PRELIMINARY STATEMENT

A.     Nature Of The Case

This is an action by Plaintiff Christine Bennett against Defendant Army Fleet

Support ("AFS") for alleged violations of the Americans With Disabilities Act, 42 U.S.C.

---

[1]  AFS does not move for summary judgment as to Count One, Plaintiff's claim under the
Americans with Disabilities Act.

§ 12101, *et seq.* (Count One), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.

§ 794 (Count Two) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

through 2000e-17 (Count Three).  AFS is the contractor that has provided maintenance

and logistics support for rotary-wing aircraft at Fort Rucker, Alabama since December 1,

2003.

Bennett was injured in March 2002, while working as an Armament, Avionics,

Electrical and Instrument Technician ("AAE&I Tech") for DynCorp Technical Services,

LLC, the predecessor maintenance/logistics contractor at Fort Rucker.  Bennett

underwent four surgeries, including three knee replacements as a result of that injury.

In April 2004, Bennett was certified as having reached maximum medical

improvement and the degree of her permanent impairment was certified by her treating

physician.  In connection with those decisions, Bennett underwent a Functional Capacity

Evaluation ("FCE") which revealed limitations on her ability to lift, carry, push/pull,

bend, squat, kneel, climb, crawl, stand, walk, reach and balance.  (Exhibit 16, p. 4 to

Bennett Dep. (Exh. B to this motion.))  She was evaluated to be "able to work at the

LIGHT Physical Demand Level for an 8 hour day...."  (*Id.,* p. 2.)  The Evaluation further

stated:

> 5.    Job Match?  NO.  The patient does not demonstrate the
>       ROM [Range of Motion], Strength, endurance, or
>       balance to carry out the essential functions of an

2

> avionics technician with AFS.  Several Tests were
> stopped due to elevated HR [heart rate].

(*Id.,* p. 1.)  Bennett's treating physician issued a return-to-work slip to her, subject to

"work restrictions based on FCE."  (Exhibit 21 to Bennett Dep. (Exh. B to this Motion).)

After receiving her return-to-work slip, Bennett requested to work for AFS, the

then-contractor at Fort Rucker, as an AAE&I Tech.  AFS declined to employ Bennett

determining that it could not accommodate the work restrictions contained in her FCE.

In January 2005, Bennett again requested to work for AFS as an AAE&I Tech and

was turned down because, *inter alia,* AFS concluded that it could not accommodate her

physical limitations.  This suit grows out of that decision.

AFS denies that it has discriminated against Bennett in violation of any of the

three statutes cited, or for any other impermissible reason.  In the present motion, AFS

moves for summary judgment as to Bennett's claim that AFS is subject to the

Rehabilitation Act of 1973, as amended (Count Two), and her claim that she was treated

differently than similarly situated males in violation of Title VII of the Civil Rights Act of

1964, as amended (Count Three).

3

**B.    Proceedings To Date**

On August 1, 2005, Bennett filed a Charge of Discrimination with the Equal

Employment Opportunity Commission.  She checked boxes indicating her claims of

"sex", "disability" and "other" ("disparate treatment") discrimination.  On May 9, 2006,

the EEOC issued its Dismissal and Notice of Rights letter.  Bennett filed the instant

lawsuit on August 11, 2006.  Discovery is on-going and scheduled to conclude on July

30, 2007.


## II    UNDISPUTED MATERIAL FACTS

**A.    AFS's Contract To Maintain Aircraft in The Flight Training Programs at Fort Rucker**

1.      AFS was the successful bidder in response to a Request for Proposal issued

by the US Army Aviation & Missile Command ("the Government"), to provide aircraft

maintenance and logistics support to the flight training programs at Fort Rucker,

Alabama, effective December 1, 2003. (Hamlin Aff. (Exh. A), ¶ 3).


2.      This Contract is the largest aircraft maintenance contract in the Department

of Defense. (*Id.*, ¶ 5.)

4

3.      Prior to December 1, 2003, DynCorp Technical Services, LLC ("DynCorp") was the Contractor providing maintenance services and logistics support to the flight training programs at Fort Rucker. (*Id.*, ¶ 4.)

## B.      Bennett's Injury at DynCorp.

4.      Bennett was employed by DynCorp as an Armament, Avionics, Electrical, and Instrument Technician ("AAE&I Tech") in February 1999. (Bennett dep. (Exh. B), 29: 3-7; 34: 13-36:5.)[2]

5.      An AAE&I Tech inspects, checks, troubleshoots, repairs, overhauls, maintains and preserves avionics and similar equipment, performs calibration of tools and equipment, and performs boresighting operations on aircraft. (*Id.*, exh. 7 to Bennett Dep. (Exh. B).)

6.      To perform the essential physical functions of the AAE&I Tech's position, an employee must

> a.      Be able to lift at least 50 pounds on an occasional basis from all levels.  Levels include floor-waist, waist-shoulder, and shoulder to overhead.
>
> b.      Be able to push and/or pull at least 100 pounds on an occasional basis.

---

[2] Deposition references are to page and line, e.g., "29:3-7" refers to page 29, lines 3 through 7; "34:13-36:5" refers to page 34, line 13 through page 36, line 5.

    c.      Be able to bend/kneel/squat on a frequent basis.

    d.      Be able to climb a ladder on an occasional basis while holding at least 30 pounds in one hand.

    e.      Be able to frequently reach to shoulder and overhead level.

    f.      Be able to perform simple grasp and fine manipulation tasks on a frequent basis.

    g.      Be able to crawl on an occasional basis. (Brown Aff. (Exh. C), ¶ 6 & Attach. 4.)

7.      The "regular duty physical demands" of the AAE&I Tech's job have been rated as either "medium-heavy" or within the "medium strength classification." (*Id.*; exh. 16, p. 1, to Bennett Dep. (Exh. B).)

8.      Bennett re-injured her right knee on March 20, 2002, while working for DynCorp.[3] (Bennett Dep. (Exh. B), 126:12 - 127:16.)

9.      Bennett underwent arthroscopic surgery on her right knee in April 2002. (*Id.*)

---

    [3] Bennett first injured her right knee while in the eighth grade.  She had undergone two surgeries on that knee before going to work for DynCorp in 1999. (Bennett Dep. (Exh. B), 128:6-21.)

10.     Bennett returned to work for DynCorp on "light duty" at the end of August 2002. (*Id.*, 128:22 - 129:7.)

11.     On January 17, 2003, Bennett underwent the first of three knee replacements to her right knee.  The last one occurred on December 9, 2003. (*Id.*, 158:2 - 160:2.)

12.     After January 17, 2003, Bennett did not return to work for DynCorp prior to the termination of its contract with the Government on November 31, 2003. (*Id.*, 158:2-7.)

## C.     Bennett's Application To Work For AFS

13.     Bennett was certified as having reached maximum medical improvement on April 13, 2004, over two years after her injury. (*Id.*, 199:23 - 200:23 & exh. 16, p.2 thereto.)

14.     In connection with that decision, Bennett underwent a Functional Capacity Evaluation ("FCE") on April 6, 2004.  (*Id.*, 189:16 - 191:5 & exh.'s 16, 17 & 18 thereto).

15.    In the categories of "critical balancing," "squatting," "crawling," "ladder climbing," "leg lift," "barrier lift," and "power lift," Bennett's evaluation was "No."  (*Id.,* exh. 16 to Bennett Dep. (Exh. B), p. 4).

16.    In the categories of "kneeling," "bending," "standing," "walking," and "overhead reaching," Bennett's evaluation was "occasional."  (*Id.*)

17.    In her ability to do a "one hand carry," Bennett was limited to "5 lbs" "occasionally" and "15 lbs." "infrequently."  There were additional limitations on her "stair climbing" ("infrequent"), "overhead reaching" ("infrequent") and other lifting abilities, e.g., "two hand carry," and "back lift."  (*Id.*)

18.    In pertinent part, the "Outcome Summary" of the FCE stated as follows:

    a.    Regular Duty Job Title: Avionics technician

    b.    Regular Duty Physical Demands: MEDIUM-HEAVY by best estimate and from patient's verbal job description.

    c.    Valid FCE?  Fully Valid with material handling, ROM, musculoskeletal exertion, etc....

    d.    Patient Physical Demand Level: LIGHT

    e.    **Job Match?  NO.  The patient does not demonstrate the ROM, Strength, endurance, or balance to carry out the essential functions of an avionics technician with AFS.  Several tests were stopped due to**

**elevated HR. ...** (*Id.*, exh. 16, p.1) (emphasis
supplied).

19.    The "Recommendations" on the FCE report were, in part, as follows:

a.    Work release to the LIGHT physical demand classification within
the FCE summary sheet guidelines due to poor CV [cardio vascular]
fitness and limited muscular endurance, per judgment of Dr.
Granger.

b.    The patient should be fine for constant sitting and upper extremity
activity to include assembling, supply, etc., as well as occasional
standing and walking activities, as outlined on the FCE form.

c.    Continue PT [physical therapy] with special emphasis on guad
strengthening, gait, cardiovascular fitness, and balance activities.
(*Id.*, p.2.)

20.    Bennett's impairment was calculated as "75% of the lower extremity and
30% of the whole person ...." (Exh. 17, p.1 "Recommended Impairment," to Bennett Dep.
(Exh. B)).

21.    Bennett's surgeon and treating physician, D. Keith Granger, M.D., agreed
with this Impairment Rating and certified that it was medically correct. (*Id.*, p.2.)

22.    On April 13, 2004, Dr. Granger issued Bennett a return-to-work slip subject
to "work restrictions based on FCE." (Bennett Dep. (Exh. B), 201:1-14; 203:19 - 204:12
& exh. 21 thereto).

9

23.     On or about April 13, 2004, Bennett applied for a job as an AAE&I Tech with AFS. (*Id.*, 204:13-20.)

24.     AFS concluded that Bennett could not perform the essential functions of the AAE&I Tech's job and it declined to employ her in that position. (*Id.*, 209:1-11 & exh. 22 thereto).

25.     In January, 2005, Dr. Granger issued another Medical Pass stating that Bennett was able to return to work with the following restrictions:

- May climb stairs with railing.

- May lift up to 30-40 pounds.

- No prolonged standing or walking.

- No climbing, bending or stooping.  (*Id.*, 262:15 - 23 & exh. 37 thereto).

26.     Bennett presented the Medical Pass signed by Dr. Granger, along with an unsigned, undated letter ("To Whom It May Concern") that Bennett had prepared for Dr. Granger's consideration, to Tammie Maddox, Administrative Coordinator/Workers' Compensation, on or about January 13, 2005.  (Maddox Aff. (Exh. D), ¶ 3 & Attach. 1.)

10

27.    According to Bennett, she gave the medical pass and letter to Maddox and said, "My doctor's office had just returned these to me and I was . . . turning them in . . . to try to return to work."  (Bennett Dep. (Exh. B), 261:2 - 262:9).

28.    Maddox stated that Bennett presented the letter to her as a "letter from my physician."  (Maddox Aff. (Exh. D), Attach. 1.)

29.    AFS again declined to employ Bennett as an AAE&I Technician.  (Bennett Dep. (Exh. B), 266:8-9.)

30.    On March 1, 2005, Tom Green, AFS's General Manager, responded to a request to "reinstate Ms. Bennett to the employment of AFS" from the President and Directing Business Representative of Bennett's Union.  Green gave three reasons for AFS's declining to employ Bennett:

> a.    AFS was unable to accommodate the restrictions placed on her by the FCE and Dr. Granger's letter of February 4, 2005.
>
> b.    The Union had not indicated its willingness to permanently waive seniority rights (and associated provisions in Article 35 of the collective bargaining agreement) and Bennett's right to reclassify to other locations and/or classifications.

11

c.     In addition to Bennett's work restrictions, there were "misstatements of fact" made by Bennett in presenting the medical slip and alleged letter from Dr. Granger to AFS in January 2005.  (Green Aff. (Exh. E), ¶ 3 & Attach. 1.)

31.     On August 1, 2005, Bennett filed her Charge of Discrimination with the EEOC.  (Bennett Dep. (Exh. B), 249:7-16 & exh. 29 thereto).

## C.     Bennett's Taking Of Narcotics/AFS's Policy Against Same.

32.     AFS prohibits employees from taking narcotics during their shift or within six hours prior to the start of their shift.  (Brown Aff. (Exh. C), ¶ 3 & Attachments 1-3.

33.     Bennett has been under the care of a pain management physician, Dr. Michael Flanagan, since March 2003.  Dr. Flanagan has regularly prescribed various narcotics and medications to Bennett since that date.  (Bennett Dep. (Exh. B), 177:14 - 178:12 & exh.15 thereto).

34.     In April 2004, when Bennett applied for employment with AFS, Dr. Flanagan was prescribing for Bennett two tablets daily of "Kadian," a sustained release capsule containing 50 mg of morphine sulfate (an opioid analgesic), and two tablets daily

of Lortab 10 (mg), a hydrocodone bitartrate and acetaminophen.  (Bennett Dep. (Exh. B),

180:12 - 182:16 & exh. 14 & 15 thereto, and Exh.'s I & J to this Motion.)

35.    Dr. Flanagan has continued to prescribe two tablets of Kadian (50 mg) and

two tablets of Lortab (10 mg) daily to Ms. Bennett since April, 2004.  (*Id.*)

**D.    Bennett's Filing of the Instant Lawsuit.**

36.    On May 9, 2006, the EEOC issued its Dismissal and Notice of Rights

letter. (*Id.*, 285:12 - 20 & exh. 41 thereto).

37.    On August 11, 2006, Bennett filed her initial Complaint in the United States

District Court for the Middle District of Alabama. (Doc. 1.)

**E.    Re:  Bennett's Allegations In ¶ 33 of Count Two (Rehabilitation Act Claim)**

38.    AFS was awarded this Contract through competitive bidding that involved

several bidders, including the incumbent contractor, DynCorp, and a previous contractor,

Sikorsky Support Services Incorporated ("SSSI").  (Hamlin Aff. (Exh. A), ¶ 4).

39.    The Government has been awarding maintenance service contracts at Fort Rucker through competitive bidding in this manner for approximately fifty years.  (*Id.*, ¶ 9.)

40.    The base period for AFS's Contract was for one year, with options for the Government to extend it up to a total of ten years, three months.  Currently, the Contract has been extended by the Government through September 30, 2008.  (*Id.*, ¶ 6.)

41.    The services performed by AFS under its Contract are on a "Cost Reimbursable Plus Award and Incentive Fee" basis.  This is in accordance with the Request for Proposal issued by the Government.  In other words, AFS is reimbursed by the Government for its costs, plus an agreed percentage of the savings below targeted costs and the opportunity for incentive fees, based on performance.  (*Id.*)

42.    All bidders responding to the Government's Request for Proposals submitted their Proposals on the above basis. (*Id.*, ¶ 4.)

43.    The Government's Request for Proposals provided that "[a]ll work will be performed in government furnished facilities at Fort Rucker, Alabama, and other locations as required."  It also provided that "[t]he Government will furnish the materials, supplies, equipment, machinery, [and] tools specified in the exhibits [to the Request for

14

Proposals]." (*Id.*, ¶ 7 & Attach. 1 (Continuation Sheet), Section C.1 ("Introduction") &

Section C.10.1.1 ("Government Facilities") thereto.)

44.    The exhibits to the Request for Proposals detail that the Government would

provide: existing aircraft maintenance facilities; Government-owned vehicles; new

equipment training for the maintenance of new equipment that the contractor would be

required to support; protective and flight clothing; utilities; aviation and motor vehicle

fuels, oils, and petroleum products required in the execution of the Contract; and

reproduction (duplication) services." (*Id.*, Section C.10 and Section J, Attachments 9, 9a,

10, 11 & 14 thereto).

45.    The Government owns the real property and facilities at Fort Rucker. (*Id.*, ¶

8.)

46.    Were the Government not to furnish the property and services listed in its

Request for Proposal, the successful bidder would have to furnish that property and, in

turn, charge the Government for same on a "cost-plus" basis. (*Id.*, ¶ 9.)

47.    The Government's furnishing of facilities and property to AFS does not

increase AFS's profits. If anything, it reduces AFS's profits since the Contract is a "cost-

plus" one, and AFS has no opportunity to earn a profit on the costs of the facilities and property furnished by the Government. (*Id.*, ¶ 10.)

48.    AFS is subject to numerous regulations, including Department of Defense regulations and Department of the Army regulations, in performing its Contract for the Government. (*Id.*, ¶ 11 & Attachment 1 ("Continuation Sheet"), Section C.12 thereto.)

**F.    Re:  Bennett's Allegations of Gender Discrimination In Count Three (Amended Paragraph ¶ 37)**

49.    Bennett has identified the following males as having received accommodations denied to her: Steve Milstid; Jerry Fowler; Perry "Bullet" Phelps and Thomas Ford.[4]  (Bennett Dep. (Exh. B), 87:16 - 91:8; 142:18 - 145:9; 145:21 - 147:11; 232:3-22; 233:11-20.)

50.    Steven Milstid, an AAE&I Lead, does not have a permanent disability requiring accommodation.  For forty-five days (from November 21, 2005 until January 5, 2006), he was temporarily accommodated for the following limitation: "no weight bearing on right ankle." (Brown Aff. (Exh. C), (Exh. 3, ¶ 5).)

---

[4]  Bennett identified this individual as "Tom" or "Tony" Ford.  AFS has concluded from the information given by Bennett, and its records, that she is referring to "Thomas" Ford.

51.     Since he has been employed by AFS, Thomas Ford has worked as a Records Specialist Lead.  He has never been a mechanic at AFS.  In all, he has worked at Fort Rucker for the various aircraft maintenance contractors for over twenty-three years: twenty as a Records Clerk, three as a Production Clerk, and six months as a Monitor.  He has not worked as an aircraft mechanic during this time.  (Ford Aff. (Exh H), ¶ 3.)

52.     After returning from five months short term disability leave in 2005, Ford was temporarily accommodated for three to four weeks with no lifting over 25 pounds.  He has not been accommodated in any manner since that date.  (*Id.,* ¶ 4.)

53.     Jerry Fowler has not used a morphine pump, or other narcotics, in violation of AFS's rules.  In 1999, while employed by DynCorp, Mr. Fowler was allowed by that company to use a morphine pump for approximately three or four days after returning to work from a short term disability leave of approximately three weeks.  Mr. Fowler has not been accommodated for any medical condition or drug usage while employed by AFS.  (Fowler Aff., (Exh. F) ¶¶ 3-6.)

54.     Perry "Bullet" Phelps retired from AFS in September 2004, less than one year after AFS became the maintenance contractor at Fort Rucker.  To supervision's knowledge, Mr. Phelps did not take Lortabs or other narcotics while employed by AFS.

17

It would have been a violation of AFS's policies for him to have done so.  There are no records that he was authorized to take any medications at work. (Thomasino Aff. ¶¶ 3-7, and Brown Aff. (Exh. C), ¶¶ 3 & 4, and Attach.'s 1-3.)

## <u>ARGUMENT AND AUTHORITIES</u>

**A.    Standard For Summary Judgment**

The standard for summary judgment in the Eleventh Circuit has been articulated

many times by that court and this court.  See, e.g., *Wilson v. B/E Aerospace, Inc.*, 376

F.3d 1079, 1085 (11th Cir. 2004); *Perryman v. First United Methodist Church*, 2007 WL

703604, pp. 4-5 (M.D. Ala. 2007); and *Herawi v. State of Alabama Department of*

*Forensic Sciences*, 311 F. Supp. 2d. 1335, 1339 (M.D. Ala.2004).  In 2000, the Eleventh

Circuit reversed its previous stand that tended to disfavor summary judgments in job

discrimination cases and held "that the summary judgment rule applies in job

discrimination cases just as in other cases.  No thumb is to be placed on either side of the

scale."  *Chapman v. A1 Transport*, 229 F.3d. 1012, 1026 (11th Cir. 2000).  Granting

summary judgment, in short, rests upon the court's consideration of all evidence in the

light most favorable to the nonmovant and finding that there is an absence of evidence to

support the nonmovant's case.  "A mere 'scintilla' of evidence supporting the opposing

party's position will not suffice; there must be enough of a showing that the jury could

reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).


Under the Supreme Court's trilogy, which over two decades ago articulated the

basis for summary judgments, to defeat summary judgment the nonmovant, in this case,

Bennett, must show that there is a "genuine issue of *material* fact."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986)(emphasis in original).  Bennett "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed.2d 538 (1986).  The trial court decides which facts are material as a matter of law.

The movant, in this case AFS, is entitled to summary judgment as a matter of law when the nonmovant has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 265 (1986).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . ." *Anderson*, 477 U.S. at 247-48, 106 S. Ct. at 2510, 91 L. Ed. 202 (emphasis in original).

"The court is not obliged . . . to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative."  *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997) *citing Anderson*, 477 U.S. at 249, 106 S. Ct. at 2510, 91 L. Ed. 2d 202.

**B.    There Is No Substantial Evidence That Defendant Is A "Recipient of Federal Financial Assistance".**

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, prohibits discrimination on the basis of disability by recipients of "Federal financial assistance."[5] The Act does not define the term "Federal financial assistance;" however, the implementing regulations of the various federal agencies, including the Department of Defense, expressly exclude procurement contracts, insurance agreements, and guaranty contracts from its coverage.[6]

---

[5] Section 504 provides, in part, as follows:

> "No otherwise qualified individual with a disability in the United States, as defined in §705(20) of this Title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . . The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation Comprehensive Services, and Developmental Disability Act of 1978. . . .

29 U.S.C. §794(a).

[6] The Department of Defense's regulations define "federal financial assistance" as follows:

> "*Federal financial assistance.*  Any grant, loan, contract, (**other than a procurement contract or a contract of insurance or guaranty**), or any other arrangement by which the Federal Government provides or otherwise makes available assistance in the form of:

> (1)    Funds.
> (2)    Services performed by Federal personnel, including technical assistance, counseling, training, and provision of statistical or expert information.
> (3)    Real and personal property or any interest in or use of such property, including:
>     (i)    Transfers or leases of such property for less than fair market value or for reduced consideration.
>     (ii)    Proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal government.

32 CFR § 56.3 (b)(emphasis supplied).  See also 28 CFR §41.3(e) (general Justice Department implementing

In *Arline v. School Bd. of Nassau County*, 772 F.2d 759 (11th Cir. 1985), the Eleventh Circuit stated, "[w]e agree that when the federal government makes payments for obligations incurred as a market participant, such payments do not constitute 'federal assistance'". *Id.* at 762 (citations omitted). This has been understood to be "explicit [] accept[ance] [of] the procurement contract exception set forth in the regulations". *Jones v. Alabama Power Co.*, 10 A.D.D. 1095, 3 A.D. Cas. (BNA) 1717, 1731 (1995). Judge Propst, who rendered the decision in *Jones*, also noted that, in the Eleventh Circuit's subsequent decision in *Moore v. Sun Bank of Florida,* 923 F.2d 1423 (11th Cir. 1991), nullifying a portion of the Small Business Administration Regulations defining "federal financial assistance," the Circuit Court "expressly did not nullify that portion of the regulations which excludes procurement contracts from the definition of 'federal financial assistance.'" *Jones*, 3 A.D. Cas. at 1730-31, quoting *Moore*, *supra.* at 1430. Accordingly, Judge Propst "refuse[d] to extend the definition of 'federal financial assistance' to include procurement contracts." 3 A.D. Cas. at 1731.

Another court has summarized the test for federal financial assistance as follows:

> [T]he term "financial assistance" contemplates grants, loans, or subsidies without reciprocal services or benefits. *See, e.g., DeVargas v. Mason & Hanger-Silas Mason Co.* 911 F.2d 1377,

---

regulations; 14 CFR §1251.102(f) (NASA); 24 CFR §8.3 (HUD); 29 CFR § 32.3 (Department of Labor); 34 CFR §104.3(h) (Department of Education); 45 CFR §84.3(h) (HHS); and 49 CFR §27.5 (Department of Transportation).

> 1382 (10th Cir. 1990) (concluding that a corporation receives financial assistance when it receives a subsidy); *Jacobson v. Delta Airlines*, 742 F.2d 1202, 1210 (9th Cir. 1984) (finding that payments do not constitute financial assistance if they are merely compensatory); *Squire v. United Airlines, Inc.*, 973 F. Supp. 1004, 1008 (D.Colo.1997) ("Simply engaging in a contract for services with the government does not entail receipt of federal funds" for Rehabilitation Act purposes.); *Muller v. Hotsy Corp.*, 917 F. Supp. 1389 (N.D.Iowa 1996) (determining that GSA contract does not constitute financial assistance because the government's intent is to compensate for goods and services, not to provide a subsidy).

*Leskinen v. Utz Quality Foods, Inc.*, 30 F. Supp. 2d 530, 534 (D.Md. 1998).

In Plaintiff's complaint herein, she contends that Army Fleet Support "is an entity covered by §504 because it receives federal assistance in numerous forms, including, but not limited to:

1. the use of real property owned by the federal government;

2. the use of motor vehicles, specialized equipment, and other personal property owned by the federal government;

3. training or other services performed by federal personnel;

4. the lease of real or personal property owned by the federal government for less than market value; and

5. in other ways not enumerated."

*Amended Complaint*, ¶ 33.

23

The Government's Contract with AFS does dictate that "[a]ll work will be performed in government furnished facilities at Fort Rucker, Alabama and other locations as required" and that "[t]he Government will furnish the materials, supplies, equipment, machinery [and] tools specified in the exhibits to the Contract." *(See Exhibit A, Affidavit of John L. Hamlim, ¶ 7 & Attach. "1" ("Continuation Sheet"), §' C.1.).* However, the Government's provision of facilities, materials, etc. is not a "grant[], loan[] or subsidy[] without reciprocal services or benefits" from AFS. *Leskinen*, 30 F. Supp. 2d at 534. Rather, it is a requirement of the contract, imposed by the Government, for obvious, financial reasons of benefit to the Government.

The "primary objective" of the Contract is for AFS "to provide aircraft maintenance in support of the flight training programs at Fort Rucker." *(Id., ¶ 3 & Attach. "1" (Continuation Sheet) § C.1.1.)* Necessarily, AFS must be located on the premises of Fort Rucker to provide those services in a timely and efficient manner. *(Id., ¶ 8.)* The Government owns the real property and facilities at Fort Rucker. *(Id.)* Therefore, it only makes sense that the Government would require AFS to perform its services in "government furnished facilities [located] at Fort Rucker." *(Id.,* Attach. "1" (Continuation Sheet), § C.1.)

Likewise, it is financially advantageous to the Government for it to "furnish the materials, supplies, equipment, machinery [and] tools that are 'specified in the exhibits to

24

the contract'" to AFS.  The Government's Request for Proposals called for a "cost-plus"

contract, i.e., one in which the Government reimburses the successful bidder for its costs,

plus an agreed percentage of savings below target costs and the opportunity for incentive

fees, based on performance.  *Hamlin Aff.* (Exh. A), ¶ 6.  By providing the "materials,

supplies, equipment, etc.," that the successful bidder requires to perform the Contract, the

Government avoids having to pay the successful bidder on a "cost-plus" basis for

providing those goods.  AFS, the successful bidder in this instance, must turn over all

facilities, equipment, machinery, tools and unused materials and supplies to the

Government (or to the successor contractor) at the end of its Contract with the

Government.  (*Id.,* ¶ 7.)  Thus, AFS does not profit from the Government's furnishing of

the facilities and items specified in the Contract.  (*Id.,* ¶ 10.)  The fact of the matter is that

AFS loses the potential to profit by furnishing such goods to the Government on a "cost-

plus" basis.  (*Id.*)


        In *Mass v. Martin Marietta Corp.*, 805 F. Supp. 1530 (D. Col. 1992), the plaintiff

made an argument against a federal contractor, Martin Marietta, comparable to Bennett's

argument here.  Mass presented evidence that Martin Marietta received "'hundreds of

millions of dollars' in federal funds pursuant to contracts with various government

agencies" and that Martin Marietta used "government equipment in manufacturing goods

furnished to the government" under those contracts.  *Id.* 1542.  Plaintiff argued that

Martin Marietta had therefore received "Federal financial assistance," and he cited cases

involving hospitals that received "Medicare and Medicaid" payments from the

Government in support of his argument.  The court disagreed that the Government

furnished "financial assistance" to Martin Marietta, using the following analysis:

> When the government provides Medicare or Medicaid
> payments to a hospital, it receives no goods or services in
> return.  In contrast, the payments made by the government to
> defendant are part of a contract under which the government
> receives goods and services.  I conclude that *DeVargas*, not
> *Bowen* or *Baylor University Medical Center* [Medicare or
> Medicaid payment cases] supplies the applicable rule.  I also
> note that this result is consistent with the definition of
> "federal financial assistance" used in federal regulations.
> That definition specifically excludes procurement contracts. .
> . .
>
> I find no authority that either payment pursuant to a contract
> or use of government-owned property (or both together)
> constitute "federal financial assistance."  I find this evidence
> wholly insufficient to support the conclusion that the
> government intended to subsidize defendant.  No reasonable
> jury could conclude that defendant receives financial
> assistance.

*Id.* (citations omitted).  *In DeVargas*, the Tenth Circuit declared, "[A]n entity receives

financial assistance when it receives a subsidy."  *DeVargas v. Mason & Hanger-Silas

Mason Co., Inc.*, 911 F.2d 1377, 1382 (10th Cir. 1990).  The court held that a private

corporation which had won a contract to provide security inspectors to a Department of

Energy Research Laboratory, did not receive "financial assistance," because the

Government did not intend to give a "subsidy, as opposed to [an] intent to provide

compensation."  *Id.*  The court found that "the [Government's] purchase from [defendant]

26

of nonpersonal services is a procurement contract outside the reach of the Rehabilitation Act." *Id.* at 1383.

It is evident in the present case that the Government's provision of facilities, materials, supplies, etc. to AFS is <u>not</u> "financial assistance" to AFS. Rather, it is a requirement imposed by the Government for the Government's benefit in the Request for Proposals that the Government issued for competitive bidding. This provision insures that the successful bidder, in this case, AFS, will provide its services in a timely and efficient manner, and at the least cost to the Government. As in *DeVargas*, this is a "purchase [by the Government] of nonpersonal services [that] is a procurement contract outside the reach of the Rehabilitation Act." *Id.* The Eleventh Circuit has "explicitly accepted" the "procurement contract exception" to the definition of "Federal financial assistance" that is contained in the regulations of the federal agencies. *Jones,* 3 A.D. Cas. (BNA) at 1731, *citing Arline v. School Board of Nassau County,* 772 F.2d 759, 762 (11th Cir. 1985). No reasonable jury could conclude that AFS receives "financial assistance" from the Government pursuant to this Contract. Accordingly, AFS is due summary judgment on Plaintiff's Rehabilitation Act Claim (Count Two).

**C.     Plaintiff Has Not Presented Substantial Evidence To Establish A *Prima Facie* Case Of Gender Discrimination.  Therefore, AFS Is Due Summary Judgment on Plaintiff's Title VII Claim (Count Three).**

Plaintiff also claims that AFS discriminated against her because of her gender in failing to provide reasonable accommodations to her, while at the same time providing such accommodations to male employees. *Amended Complaint* (doc. 18), ¶ 37. Plaintiff has not presented any direct evidence of discriminatory treatment; therefore, she must prove a violation of Title VII by circumstantial evidence.

The shifting burden of production and the order of presentation of proof in a circumstantial evidence case was established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L. Ed.2d. 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L. Ed.2d. 207 (1981). This framework has been laid out in detail by both the Eleventh Circuit and this court on numerous occasions. *See e.g. Wilson v. B/E Aerospace, Inc.*, 376 F.3d. 1079, 1087-88 (11th Cir. 2004); *Perryman v. First United Methodist* Church, 2007 WL 703604 (M.D. Ala. 2007) at pp.3 & 5; and *Malladi v. Brown*, 987 F. Supp. 893, 908-09 (M.D. Ala. 1997).

In a nutshell, the Plaintiff first has the burden of establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997). If Plaintiff meets her initial burden of establishing, by a preponderance of the evidence, a *prima facie* case of sex discrimination, then "the burden of production shifts to the employer to

28

articulate a legitimate, non-discriminatory reason for its actions." *Wilson, supra* at 1087 (citations omitted). If the employer meets its burden of production, "then the presumption of discrimination is rebutted and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Id.* (citations omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 256, 101 S.Ct. at 1093, 1095.

In the present case, Bennett has failed to meet her burden of establishing a *prima facie* case of gender discrimination. To make out a *prima facie* case of gender discrimination through circumstantial evidence, Bennett must prove that

> (1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job.

*Wilson, supra* at 1091. In making this proof, however, the Eleventh Circuit has cautioned,

> the plaintiff and the employee she identifies as a comparator must be similarly situated "in all relevant respects." . . . the comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.

*Id.* (citations omitted).

29

Bennett has identified four males as comparators.  They are Steven Milstid, Jerry Fowler, Perry "Bullet" Phelps, and Thomas Ford.  (Bennett Dep. (Exh. 2), 87:16 – 91:8; 142:18 – 145:9; 145:21 – 147:11; 232:3-22; 233:11-20.)  Bennett contends that two of those males, Milstid and Ford, had physical limitations that AFS accommodated, and two, Fowler and Phelps, used narcotics on the job that AFS accommodated.  (*Id.*)

Bennett fails to show that she and these employees "are similarly situated in all relevant respects."  *Wilson, supra* at 1091.  For starters, Milstid and Ford were not permanently disabled, as Bennett contends she is. **Milstid**, the AAE&I Tech Lead whom Bennett says broke his ankle and, during his recovery, used crutches and had others lift his tool boxes, etc., does not have a permanent disability requiring accommodation. Milstid  was  limited for only  forty-five days in placing  weight on his right ankle, a circumstance that AFS was able to accommodate.  (Brown Aff. (Exh. C) ¶ 5.)  **Ford,** the second male cited by Bennett, was not moved from the position of aircraft mechanic to a clerk's position by AFS, as Bennett alleges.  (Ford. Aff. (Exh. H), ¶ 3.)  Ford hired-in with AFS on December 1, 2003, as a Records Specialist, a position he still maintains. (*Id.,* ¶2.)  In fact, Ford has worked as a Clerk (either Records or Production Control) or Monitor for AFS and previous contractors at Fort Rucker for over twenty-three years. (*Id.,* ¶ 3.)  In 2005, following Ford's five month disability leave (that related to an injury

to his back and leg he received while working for Sikorsky in the mid-80's), AFS was

requested to limit Ford's lifting for four weeks to no more than 25 pounds. (*Id.,* ¶ 4.)

AFS  accommodated this temporary limitation on Ford. (*Id.*)


As to the two individuals whom Bennett contends AFS has accommodated their

taking narcotics while at work, the undisputed facts do not substantiate Bennett's claim.

**Fowler** states that he has not used a morphine pump, or other narcotics, while employed

by AFS. (Fowler Aff. (Exh. F), ¶ 3.)  In 1999, while working for DynCorp, Fowler was

allowed to use a morphine pump for "three or four days" by Dyncorp after he returned

from approximately three weeks of disability leave. *(Id.,* ¶ 4.)  Since AFS began

performance of its contract in December, 2003, there have not been any medications on

file for Fowler, and no medical restrictions have been presented to AFS for him. (Brown

Aff. (Exh. C), ¶ 4.)  Bennett's testimony regarding **Phelps** is hearsay <u>and</u> based on her

"understanding" of what Phelps did while employed by <u>DynCorp</u>.  Bennett Dep. (Exh.

B), 145:21 - 147:11.  Bennett cannot speak to Phelps' practices while employed by AFS,

because she has not worked at Fort Rucker since AFS became the aircraft maintenance

contractor. (*Id.*, 158:2-7; 205:12 - 207:7.)  Phelps only worked for AFS for ten months

(December 1, 2003 - September 30, 2004).  (Brown Aff. (Exh. C), ¶ 4.)  He did not, to

supervision's knowledge, take Lortab or other narcotics while employed by AFS.

(Thomasino Aff. (Exh. G), ¶¶ 3-7.)  There is no record that he was authorized to take any

medications at work.  (Brown Aff. (Exh. C), ¶ 4.)  Had he done so, it would have been a

violation of AFS's policy prohibiting the taking of narcotics during a shift or within six

hours prior to the start of a shift.  (*Id.,* ¶ 3 & Attach. 1-3.)

Thus, Bennett has not identified any male whose circumstances are even remotely

comparable to her's --- much less "nearly identical" --- and she fails to establish her *prima*

*facie* case of gender discrimination.  *Wilson, supra* at 1091.  Accordingly, AFS is due

summary judgment on Bennett's Title VII claim (Count Three).

## CONCLUSION

There are no material facts in dispute.  The terms of AFS's Contract with the

Government for the delivery of maintenance services and logistics support were dictated

by the Government for obvious, financial reasons of benefit to the Government.  The

Contract was competitively bid and all bidders were subject to the same terms and

conditions.  The Contract does not result in a grant, loan, or subsidy to AFS.  It is a

"procurement contract" which is expressly excepted from the definition of "federal

financial assistance" in the Department of Defense's regulations.  32 CFR § 56.3(b).  The

Eleventh Circuit has "explicitly accepted" the "procurement contract exception" in the

context of another federal agency's regulations.  *Jones,* 3 A.D. Cas. (BNA) at 1731, *citing*

*Arline,* 772 F.2d at 762 (11th Cir.).

Bennett has also failed to show that any similarly situated, male employee with comparable physical limitations and requiring narcotics such as Bennett, has been accommodated by AFS, while she has not.

Accordingly, judgment should be entered for the Defendant, Army Fleet Support, LLC as to Counts Two and Three of Plaintiff's Amended Complaint.

Respectively submitted,

ARMBRECHT JACKSON LLP
Post Office Box 290
Mobile, Alabama 36601
Phone:        (251) 405-1302
Facsimile:    (251) 432-6843

By____/s/ Kirk C. Shaw (SHAW0466)_____

Attorney for Army Fleet Support LLC

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filings to the following:

Jon C. Goldfarb (jgoldfarb@wcqp.com)
WIGGINS, CHILDS, QUINN & PANTAZIS P.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203

33

Ethan R. Dettling (edettling@wcqp.com)
WIGGINS, CHILDS, QUINN & PANTAZIS P.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203


      /s/ Kirk C. Shaw (SHAWK0466)