**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CHRISTINE BENNETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v** | ) | **1:06-CV-723-MHT** |
| | ) | |
| **ARMY FLEET SUPPORT, LLC** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT</u>**

COMES NOW, Plaintiff, by and through undersigned counsel, and

submits this brief in opposition to the Defendant's Motion for Partial Summary

Judgment in the above-styled cause.

**INTRODUCTION**

Christine Bennett filed this lawsuit against Army Fleet Support, LLC

("AFS") because she was denied the opportunity to work for AFS, with or

without reasonable accommodations, following a series of three total knee

replacement surgeries to her right knee.  AFS is a defense contractor that

provides maintenance to the aircraft fleet at Fort Rucker.  AFS has the largest

fleet maintenance contract with the Department of Defense and it employs

1

more than three thousand people at Fort Rucker. AFS has taken the position that it cannot accommodate Ms. Bennett at any of the more than three thousand positions at Fort Rucker.

Plaintiff's lawsuit claims sex discrimination under Title VII, disability discrimination under the Rehabilitation Act of 1973 ("the Act"), and disability discrimination under the Americans with Disabilities Act. AFS filed a motion for partial summary judgment, claiming entitlement to judgment in its favor regarding Ms. Bennett's Title VII claim[1] and her Rehabilitation Act claim. AFS did not seek summary judgment regarding Bennett's claims under the ADA. Therefore, her ADA claims will proceed to trial on a date set by this Court.

AFS seeks summary judgment with respect to Plaintiff's claims under the Rehabilitation Act solely on the ground that it is not subject to the Act. Therefore, the sole issue to be resolved by the Court is whether AFS is a private entity that received federal financial assistance such that it is brought within the coverage of Section 504 of the Act.

---

[1] Bennett concedes that she cannot establish a claim for sex discrimination and that partial summary judgment is due to be granted with respect to that claim.

**STATEMENT OF UNDISPUTED FACTS**[2]

1.     AFS is a private business that was awarded a contract with the U.S. Department of Defense to perform helicopter maintenance of the Army's fleet at Fort Rucker, Alabama. (Ex. C, Affidavit of John L. Hamlin).  The contract began on December 1, 2003. (*Id.*).

2.     AFS' policy manual states that "Army Fleet Support is a government contractor and is therefore subject to the  provisions of the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, and the Vietnam Era Veterams Readjustment Assistance Act of 1974." (Ex B, Hamlin Depo., p.70, lines 2-10; Ex. D, Excerpt from AFS Policy Manual).

3.     AFS agreed, as a term of its contract with the Department of Defense ("DoD"), to subject itself to DoD's regulations.  (Ex C, Affidavit of John L. Hamlin, ¶ 11 and Attachment to Aff., Section C.12).  DoD's regulations include provisions implementing Section 504 of the Act.

4.     During performance of the contract, AFS received training provided by persons employed with the Equal Employment Opportunity Commission approximately two times per year.  (Ex A, Whelan Depo., p.52, lines 11-20).

---

[2]  Bennett will set forth only such facts as necessary to address AFS' argument that it is not an entity covered by Section 504 of the Rehabilitation Act.  She fully reserves her right to contest all other facts stated in AFS' statement of "undisputed" facts at the trial of this matter.

This training was provided to AFS employees free of charge. (Id., p.54, lines 2-6). There is no contract requirement that AFS receive such training by the EEOC. (Ex B, Hamlin Depo., p.57, lines13-16). Darlene Whelan, Director of Human Resources, also periodically telephoned the EEOC for guidance on compliance with the ADA. (Ex A, Whelan Depo., p.52, lines 1-4). Whelan testified that "they [EEOC representatives] give us their business cards and they **provide assistance** to us whenever we need it." (Id., lines 13-15)(Emphasis supplied)

5.    AFS' employees also received health and wellness training through the U.S. Army's "Soldier Center" at Fort Rucker. (Ex A, Whelan Depo., p.32, lines 1-12). The Soldier Center is an Army facility that, among other things, provides support for Army personnel on health-related issues including exercise, healthy eating habits, stress management, and smoking cessation. (Id., p. 34, lines 12-18). AFS' employees are permitted to participate in health and wellness activities along with military personnel. (*Id.*, p.36, lines 11-18;).

  The military coordinates the programs and classes which are taught by civilian employees of the Department of Defense ("DoD"). (*Id.*, pp.35-36; Ex B, Hamlin Depo., p.58, line 9). AFS received the benefits of the Army's health and wellness programs offered through its Soldier Center free of charge. (Ex

4

A, Whelan Depo., p.36, lines 6-10).  These free programs are outside the scope of AFS' contract with the DoD because there is no requirement in AFS' contract that its employees participate in such programs. (Ex B, Hamlin Depo., p.59, lines 15-19).

6.      Further, AFS' management employees received free training during the contract on "lean management" practices.  (*Id.*, p.41, lines 15-19; p.42, lines 19-21).  "Lean" training is designed to increase efficiency and productivity. (*Id.*, p.41, lines 22- p.42, line 2).  Some "lean" training was provided by government employees. (*Id.*, p.42, lines 15-18).   Approximately twenty-five to thirty AFS employees received lean training at the University of Tennessee in Knoxville, Tennessee. (*Id.*, p.43, lines 2-7). The training lasted one week and consisted of forty hours of training through the University of Tennessee's School of Business. (*Id.*).  All expenses related to the Lean training were paid by the DoD, including travel expenses and the costs associated with staying for a week in Knoxville. (*Id.*, p.44, line 2).

7.      On another occasion, AFS employees traveled to Montgomery, Alabama, to receive further Lean training. All costs associated with this training also were paid by the DoD.  (*Id.*, p.51, lines 21-23).

8.      Ken Hamlin is one of the managers who received Lean training. (*Id.*,

p.45, lines 21-23). He is a better manager as a result of this training and his training will transfer to any other position with AFS or with any other company. (*Id.*, p.46, lines 2-5). AFS has shown tangible results from Lean training and has become more efficient as a result of the training. (*Id.*, p.46, lines 6-9). Further, AFS is entitled to certain bonus payments under the Ft. Rucker contract based on reaching certain performance and cost savings goals. (*Id.*, p.17, lines 12-19; Ex. C, Hamlin affidavit).

9.    AFS has plans to continue its operations after the conclusion of the Ft. Rucker contract. (Ex B, Hamlin Depo., p.47, lines 13-15). AFS has explored at least one other business opportunity outside its Ft. Rucker contract. (*Id.*, p.46, lines13-15).   AFS' managers meet on occasion to discuss future planning and future business opportunities for AFS. (*Id.*, p.48, lines 12-14). The Lean training received by AFS' managers will benefit AFS in any future business opportunity outside the Ft. Rucker maintenance contract. (*Id.*, p.53, lines12-16). Although the Lean training has benefits to AFS beyond the Ft. Rucker contract, the Lean training was provided by the government free of charge.

10.   AFS also received "new equipment training" taught by military personnel. (*Id.*, p.55, lines 3-9). New equipment training was provided for the

6

Black Hawk helicopter. (*Id.*). The company also received hazardous materials training. (*Id.*, p.57, lines 5-7). The company does not pay any sums to the DoD for such training.

11.    AFS received the rent-free use of real property at Ft. Rucker, including the use of land, aircraft hangars, and buildings necessary to the performance of the maintenance contract. (*Id.*, p.26, line 20-p.27, line 4).

12.    AFS had free access to the government's library materials at Ft. Rucker, which include technical manuals and copies of all applicable Army/DoD regulations. (*Id.*, p.33, line 7-9).

13.    AFS received government furnished equipment (GFE) under the terms of its contract with the DoD. (*Id.*, p.27, line 12-15 ). All GFE is provided rent free. (*Id.*). AFS has used the GFE during the contract. (*Id.*, p.27, line 23 - p.28, line 3). This GFE includes, but is not limited to, several hundred motor vehicles, more than one hundred golf carts (or similar carts),  computers, office equipment, and specialized tools, among other things. (*Id.*, p.29, line 1-4). The contract has a lengthy addendum itemizing the GFE associated with the maintenance contract. (Ex C, Affidavit of John L. Hamlin, ¶ 7, and Attachments to Aff., Section 10, Attachment J).

14.    The government performs all maintenance on the fleet of motor vehicles

through the Government Services Administration (GSA), and all fuel and other petroleum products are provided. (*Id.*, p.30, line 11-18).

15.    The government provides all photocopying equipment and services free of charge to AFS in the performance of the contract. (*Id.*, lines 18-20).

## ARGUMENT

Throughout its brief, AFS attempts to characterize the sum total of its involvement with the federal government as a "procurement contract" by making arguments that 1) omit key facts; 2) misconstrue existing regulations; and 3) create limitations that do not exist in the statute or implementing regulations.

The sole issue for the Court's determination is whether Plaintiff presents evidence demonstrating a genuine issue of material fact regarding whether AFS received "federal financial assistance" and is therefore  covered under Section 504 of the Act.  Section 504 provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title shall, by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving federal financial assistance...

29 U.S.C. § 794(a).

Although "federal financial assistance" is not defined in the statute itself, the

8

Department of Defense's implementing regulations define the term in 32 C.F.R. § 56.3(b) as follows:

> (b) Federal financial assistance.  Any grant, loan, contract (other than a procurement contract or a contract of insurance or guaranty), or any other arrangement by which the Federal Government provides or otherwise makes available assistance in the form of:
> (1) Funds.
> (2) **Services performed by Federal personnel**, including **technical assistance**, **counseling**, **training**, and provision of statistical or expert information.
> (3) Real and personal property or **any interest in or use of such property**, including:
> > (i) Transfers or leases of such property for less than fair market value or for reduced consideration.
> > (ii) Proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal government.

32 C.F.R. § 56.3 (emphasis supplied).  This regulation plainly provides that "services" are one form of "Federal financial assistance."  This regulation also plainly provides that the "use of" government real and/or personal property is another form of "federal financial assistance."  Here, there is no dispute that AFS received training, free of charge, provided by personnel employed by the EEOC and the DoD. AFS also had the rent free use of government furnished real and personal property.

**A.   THE REHABILITATION ACT IS INTENDED TO BE LIBERALLY CONSTRUED TO ACCOMPLISH CONGRESS' GOAL OF ENSURING THAT NO FEDERAL FUNDS ARE USED TO SUPPORT DISCRIMINATION**.

Defendant encourages this Court to adopt a narrow view of the Act to avoid its responsibility for the adverse actions it has taken against Ms. Bennett. However, the Eleventh Circuit noted in *Jones v. Metropolitan Atlanta Rapid Transit Authority*, 681 F.2d 1376, 1379 (11th Cir.1982), *cert. denied*, 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984), that "[o]n its face ... [section 504] applies to programs receiving federal financial aid **of any kind.**" (emphasis supplied).  *See also Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 1253, 79 L.Ed.2d 568 (1984).  In *Jones*, the Court also noted that "the legislative history to the 1974 amendments is replete with notations indicating that Section 504 was intended to encompass programs receiving federal financial assistance of any kind...." *Jones*, 681 F.2d at 1379-80.  Importantly, Congress' "single overriding purpose" in enacting Section 504 and similar civil rights laws was to ensure that the funds of the United States were not used to support discriminatory practices. *See United States v. Baylor University Medical Center*, 736 F.2d 1039, 1042-43 (5th Cir.1984), *cert. denied*, 469 U.S. 1189, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985). Accordingly, the language in Section 504 should be construed broadly to

accomplish the result Congress intended. *See Arline v. School Bd. of Nassau County*, 772 F.2d 759, 763 (C.A.11 1985)(noting that Congress intentionally gave a broad meaning to the term "federal financial assistance.") To adopt Defendant's narrow view of Congress' intent and the statute's actual language not only is unsupported in the case law, but also thwarts the public policy of remedying discrimination against individuals with disabilities.

**B. AFS CHOSE TO RECEIVE "TECHNICAL ASSISTANCE, COUNSELING, AND TRAINING" PROVIDED FREE OF CHARGE BY EEOC AND DoD EMPLOYEES. DoD REGULATION 32 C.F.R § 56.3(b)(2), ON ITS FACE, DEFINES "FEDERAL FINANCIAL ASSISTANCE" AS INCLUDING TRAINING BY FEDERAL PERSONNEL.**

Defendant attempts to persuade this Court by arguing that it merely entered a contract with the DoD for helicopter maintenance and the government "required" it to conduct its operations on Fort Rucker and "required" it to use government furnished equipment.   However, Defendant conveniently ignores the fact that it availed itself of training performed by federal personnel on numerous occasions even though such training is specifically enumerated in the DoD's implementing regulation.   C o n g r e s s imposes the requirements of Section 504 on those who are in a position to accept or reject Section 504's requirements as a condition of receiving federal assistance.   See *Delmonte v. Department of Business and Professional*

*Regulation, Division of Alcoholic Beverages and Tobacco of the State of Florida*, 877 F.Supp. 1563, 1565 (S.D. Fla. 1995)(citing *U.S. Department of Transportation v. Paralyzed Veterans of America*, 477 U.S. 597, 606, 106 S.Ct. 2705, 2711, 91 L.Ed.2d. 931 (1979)). AFS knowingly availed itself of free training by federal personnel and, as a result, brought itself within the DoD regulation defining "federal financial assistance."  As discussed above, the Eleventh Circuit, in keeping with the Act's legislative history, has recognized that federal assistance "of any kind" will bring a recipient within the Act's coverage.  *See Jones, supra*.

On its face, DoD regulation 32 C.F.R. § 56.3(b)(2) states that, if a program or activity receives services provided by federal personnel in the form of technical assistance, counseling, or training, then such program or activity "receives federal financial assistance."  AFS, as a defense contractor subject to DoD's regulations, received free training, counseling, or technical assistance performed by federal personnel and thereby subjected itself to the provisions of Section 504 of the Rehabilitation Act as a *quid pro quo* for accepting such services.

The undisputed evidence before the Court is that AFS received training, free of charge, performed by EEOC employees once or twice per year on

issues relating to compliance with federal employment discrimination laws. (Ex A, Whelan Depo, p. 52, lines 11-20; p.54, lines 2-6). AFS' Director of Human Resources, Darlene Whelan, also consulted with EEOC investigators by telephone, free of charge, for guidance regarding AFS' obligations under the ADA. (*Id.*, p.55, lines 1-5). This training and technical assistance provided by the EEOC was not mandated by AFS' contract with the DoD but AFS nevertheless chose to avail itself of these free services. (Ex B, Hamlin Depo, p. 57, lines 13-16).

Further, the undisputed evidence establishes that AFS availed itself of health and wellness programs through the Army's "Soldier Center" on Fort Rucker. (Ex A, Whelan Depo, p.32, lines 1-12). The "Soldier Center" is a facility owned and operated by the DoD for the purpose of enhancing the health and general well being of its soldiers. (*Id.*, p. 34). AFS employees were permitted to participate, and in fact did participate, in classes and seminars coordinated by the military and taught by civilian DoD employees. (*Id.*, p.35, lines 12-19; Ex B, Hamlin Depo, p. 58, line 9). These programs related to issues such as healthy eating habits, exercise, stress management, and smoking cessation. All participation by AFS employees was at no cost to AFS. (Ex A, Whelan Depo, p.36). AFS' contract with the DoD did not require

13

AFS employees to participate in these programs.  (Ex B, Hamlin Depo, p.59, lines 15-19).

AFS, in its brief, argues that it did not receive federal financial assistance because it only received funds through a procurement contract with the DoD, and that AFS only used government equipment and services because it was required to do so by contract.  However, neither the EEOC training nor the health and wellness training were required in the contract. Even under AFS' broad interpretation of the so-called "procurement contract exception," AFS cannot claim that the above described voluntary federal training services are within the scope of its contract. (See Movant's Brief, p. 22).  Accordingly, AFS is covered by Section 504 of the Rehabilitation Act as an entity that receives federal financial assistance.

## C.    A DISTRICT COURT IN OUR CIRCUIT HELD THAT THE ACCEPTANCE OF FREE TRAINING BY FEDERAL PERSONNEL CONSTITUTES "RECEIVING FEDERAL FINANCIAL ASSISTANCE" UNDER SECTION 504.

Defendant failed to disclose in its brief that it received free training from the EEOC and the DoD outside the scope of its contract.  Defendant also failed to discuss a district court decision in our Circuit that specifically addressed whether free training by federal personnel constitutes "federal financial assistance." *See Delmonte v. Department of Business and*

14

*Professional Regulation, Division of Alcoholic Beverages and Tobacco of the State of Florida*, 877 F.Supp. 1563, 1565 (S.D. Fla. 1995). In *Delmonte*, a federal district court held that [the defendant] was a recipient of federal financial assistance pursuant to Section 504 due to its acceptance of training by several federal law enforcement agencies at no cost. *Delmonte*, 877 F. Supp. at 1567. Specifically, ABT, the defendant in *Delmonte*, received training from the FBI, the DEA, and the Department of Treasury on law enforcement issues and techniques. *Id*.

The court first noted that, "on its face, the training of ABT employees by federal law enforcement personnel at no cost would seem to fall squarely under 'assistance in the form of...[s]ervices of Federal personnel.'" *Delmonte*, 877 F. Supp. at 1565 (quoting 28 C.F.R. § 41.3(e), the Department of Justice's implementing regulation). The court then found that ABT agreed to be within Section 504's coverage by accepting federal training because the DOJ's implementing regulations listed the type of training ABT received. 877 F. Supp. at 1565-66. The *Delmonte* opinion also stressed a contractual agreement between ABT and the FBI whereby ABT agreed that it was subject to Section 504.

Similarly, in this case, AFS entered into a written contract with the DoD

to provide helicopter maintenance.  AFS readily admits that it agreed, as a term of its contract with DoD, to be subject to DoD regulations.  Those regulations define "federal financial assistance" in a manner that includes services performed by federal personnel.    With knowledge of this DoD regulation and with a written contract obligating AFS to comply, AFS chose to avail itself of training, technical assistance, and/or counseling provided by federal personnel when it invited the EEOC to conduct on-site training sessions at no cost, and when AFS elected to participate, at no cost, in health and wellness programs established and operated by the DoD.  Accordingly, for the same reasons expressed in *Delmonte*, this court should find that AFS received "federal financial assistance" in the "form" of services performed by federal personnel under 32 C.F.R. 56.3(b)(2) and is therefore subject to Section 504 of the Act.

## D.    AFS EMPLOYEES RECEIVED OTHER TRAINING PROVIDED BY THE GOVERNMENT FREE OF CHARGE DURING THE PERFORMANCE OF ITS MAINTENANCE CONTRACT AT FORT RUCKER.

In addition to the training discussed above, AFS also failed to mention in its brief that its employees also received training free of charge on "Lean" management techniques, training on new equipment introduced by the Army, and training regarding hazardous materials.  AFS may argue these forms of

16

training were "required" as part of the helicopter maintenance contract, but AFS received training that it will continue to use after the contract terminates.

"Lean" management training is designed to help managers increase efficiency and productivity. The DoD provided forty hours of "Lean" training to AFS' management team through the University of Tennessee's School of Business. (*See Statement of Facts, ¶ 5-8*). The training lasted one week and was conducted in Knoxville, Tennessee. (*Id.*). AFS received this training at no cost including all associated travel and lodging expenses. (*Id.*) Approximately two or three AFS employees also received "Lean" training in Montgomery, Alabama, on another occasion. This training was also received at no cost to AFS. (*Id.*)

Hamlin, Director of Business and Contracts, testified that he was a more effective manager after he received the forty hours of instruction in Knoxville. (*See Statement of Facts, ¶ 5-8*). He also testified that he noted an improvement in the performance of other AFS managers in attendance. (*Id.*). Regardless of whether the government realized a cost savings as a result of the implementation of "lean" management practices, AFS also benefitted from this free training. AFS is compensated under the contract, in part, by meeting certain performance standards and cost savings goals. (Ex C, Hamlin

17

affidavit, ¶ 6).  By making AFS' management team more efficient, the free "Lean" training had the effect of making AFS more likely to reach certain performance benchmarks and cost savings goals than it would without such training.  If nothing else, the free "Lean" training provided AFS with a greater opportunity to reach performance and/or cost savings goals than without the training.

Hamlin acknowledged that the "Lean" training would benefit AFS in future endeavors outside the current Fort Rucker contract. *(See Statement of Facts, ¶ 8)*. AFS' management team periodically meets to discuss future opportunities for AFS beyond the current contract. (*Id.*).  On at least one occasion, AFS pursued an opportunity beyond the current contract. (*Id.*).  AFS has received federal financial assistance via the free "Lean" management training because it received value from such training beyond the "procurement contract."

Additionally, AFS employees also received hazardous materials training and new equipment training provided at no cost by federal personnel. (See Statement of Facts, ¶ 9).  This training was in connection with AFS' maintenance contract and was conducted at Fort Rucker by military personnel. (*Id.*).  For example, AFS received training regarding the Black

Hawk helicopter to assist AFS in performing necessary maintenance related to those helicopters. (*Id.*).  Again, this free training made AFS more likely to reach performance goals and thereby earn bonuses.

## E.    THE CASES RELIED UPON BY AFS ARE DISTINGUISHABLE.

The cases relied upon by AFS are distinguishable because those cases do not involve contractors that received free training by government personnel.  In *Mass v. Martin Marietta*, 805 F.Supp 1530 (D. Col. 1992), the only evidence presented was that Martin Marietta had "hundreds of millions of dollars" of government contracts and that it had used some government equipment in the manufacturing process for goods sold to the government. *Id.*, 805 F.Supp. at 1542.  The opinion did not discuss whether Martin Marietta employees received federal assistance in the form of training by federal personnel.  Training by federal personnel was not even mentioned  in that opinion.  Here, by contrast, there is undisputed evidence that AFS accepted training or technical assistance or counseling by federal employees that AFS was not required to accept under its contract with the DoD.

In *DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 911 F.2d 1377 (10th Cir. 1990), the evidence demonstrated only a contract between the government and the defendant for security guard services. In *DeVargas*, there

19

was no evidence presented of training or services provided by federal personnel in any form.   The plaintiff in *DeVargas* apparently relied solely on the defendant's receipt of payment for security services in arguing the defendant received federal financial assistance. These facts are distinguishable, thus rendering *DeVargas* unhelpful in analyzing the instant case.

**F.    AFS RECEIVED FEDERAL FINANCIAL ASSISTANCE IN THE FORM OF GOVERNMENT FURNISHED EQUIPMENT AND REAL PROPERTY**.

As part of its contract with the DoD, AFS received government furnished equipment (GFE) and government real property for its use. This is undisputed. The contract contains a provision listing all GFE under the contract, which does not include real property available for AFS' use. (Ex C, Affidavit of John L. Hamlin, ¶ 7, and Attachments to Aff., Section 10, Attachment J).   The contract documents list several hundred motor vehicles, more than one hundred motorized carts, computers, desks, chairs, other office equipment, among many other things. (*Id.*).   AFS, in its brief, focuses its argument on the facts that 1) the government required the use of this equipment as a condition of the contract; 2) the government saved costs as a result of the GFE; and 3) AFS did not "profit" from its use of GFE.  AFS' arguments are misplaced.

First, AFS did not have to submit a bid for this contract and it was, in no real sense, "required" to receive government furnished real and personal property for its use. AFS, with full knowledge that it would receive the rent free use of all GFE listed and the rent-free use of government real property, chose to bid for and accept the maintenance contract at Fort Rucker. If AFS did not wish to receive training and the rent-free use of government property and thereby subject itself to Section 504, then it should have explored other business opportunities.

Second, and most importantly, the fact that the government realizes a cost savings is not a factor enumerated in Section 504 itself, nor in any implementing regulations. By considering the government's cost savings, the court would be reading a limiting factor into Section 504 that plainly is not there. This reading would run afoul of Congress' intent to define "federal financial assistance" broadly in keeping with its goal of ensuring that federal funds are not used to support discrimination.

Third, the fact that AFS, in theory, could have charged the government more if it was required to furnish all the equipment required also is not a pertinent or enumerated factor. Again, neither Section 504 nor the implementing regulations include "profit" as a consideration. The statute

merely requires that a program or activity receive federal financial assistance in any of the forms enumerated. Profit by the recipient is simply not a consideration supported by the plain language of the statute.

There is no dispute that AFS has the "use of" GFE during this contract as well as "use of" government library resources, copying services, and rent-free "use of" buildings and other real property. (Ex C, Affidavit of John L. Hamlin, ¶ 7, and Attachments to Aff., Section 10, Attachment J). The implementing regulation includes "**any** interest in or **use of**" real and personal property. (emphasis supplied) *See* 32 C.F.R. § 56.3(b)(3). To espouse AFS' position would ignore the simple and broad mandate by Congress.

Further, even if profit were a consideration, AFS' apparent position that it did not benefit from GFE is unworthy of credence. AFS admits that it has a "costs plus" contract with the DoD to provide fleet maintenance and that, as part of that contract, AFS is compensated above its reimbursed costs when it meets certain performance standards and when it meets certain cost reduction goals. (Ex C, Hamlin affidavit, ¶6). As a result of using GFE, AFS has not had the logistical or administrative demands of providing and/or maintaining a fleet of motor vehicles and motorized carts. AFS was not required to provide for petroleum products for these vehicles or contend with

fluctuating fuel prices. Moreover, the company was not required to provide any office equipment, computers, or specialized tools. These reduced logistical and administrative demands have left AFS with greater capability to meet performance standards and cost savings goals. Therefore, AFS received "federal financial assistance" by its use of GFE.

Finally, although there is case law suggesting that there is a "procurement contract" exception to "federal financial assistance," the cases discussing such procurement contracts do not address the impact of rent free GFE.[3] The cases, such as *DeVargas and Martin Marietta*, involve contracts for government purchase of goods or services for fair market value. Plaintiffs in those cases contended that the receipt of government funds as payment for goods and services itself constituted federal financial assistance. The above simply does not mirror the situation before this Court.

Importantly, Plaintiff does not contend that government payments to AFS for goods or services are a form of federal financial assistance. The opinions discussed by AFS do not explain whether the contractors at issue

---

[3] The *Martin Marietta* opinion contains a sentence that reads, "I find no authority that either payment pursuant to a contract or use of government-owned property (or both together) constitute "federal financial assistance." However, this statement fails to acknowledge that the DoD's implementing regulations explicitly include "Real and personal property or any interest in or use of such property." See, 32 C.F.R. § 56.3(b)(3).

had the rent free "use of" GFE and government real property.    Rather, Plaintiff asserts that ignoring the distinction between contracts with and without the rent-free use of GFE is contrary to the plain language of the DoD implementing regulation.  The regulation provides that "any interest in or use of" government-owned real or personal property is a "form" of federal financial assistance."

As an exception to the intentionally broadly defined term "federal financial assistance," the so-called procurement contract exception should be construed as narrowly as possible so Congress' stated intent is fully realized. The procurement contract exception merely avoids the inclusion of all contracts with the government because all such contracts involve the payment of government "funds" to a contractor.  Adoption of Defendant's position would, in other words, take a narrow exception and substitute it for a clearly-defined rule, thus allowing any government contractor to shirk its duties to not discriminate under the Act.

Plaintiff asserts the  "procurement contract exception," construed narrowly, does not include contracts involving the rent-free use of government property but rather includes only contracts involving the simple exchange of federal funds for goods and services without the rent-free use of government

property.  Accordingly, AFS' contract with the DoD should not fall within the procurement contract exception because AFS used government real and personal property  at no cost.

**CONCLUSION**

AFS' Motion for Partial Summary Judgment is due to be denied with respect to Plaintiff's claim for damages under the Rehabilitation Act of 1973. AFS received "federal financial assistance" in the forms of training by EEOC personnel, training by DoD personnel, training at the University of Tennessee provided at no cost, training by military personnel, and by the rent-free use of government real and personal property.  As an entity that receives federal financial assistance, AFS is covered by the Act.

WHEREFORE, premises considered, Plaintiff respectfully requests the entry of an Order denying AFS' Motion for Partial Summary Judgment  with respect to Plaintiff's claim for damages under the Rehabilitation Act of 1973.


Respectfully submitted,


s/Ethan R. Dettling
Jon C. Goldfarb (ASB-5401-F58J)
Ethan R. Dettling (ASB-9067-T68E)
Counsel for Plaintiff

OF COUNSEL:

Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
Telephone No.: (205) 314-0500
Facsimile No.: (205) 254-1500

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the above and foregoing document has been properly filed with the Clerk of Court using the CM/ECF system which will send electronic notification to the following counsel of record:

Kirk Cordell Shaw
Mary Carol Ladd
Ambrecht Jackson LLP
PO Box 290
Mobile, AL 36601-0290
251-405-1302
Email: kcs@ajlaw.com
Email: mcl@ajlaw.com

on this the 9th day of July, 2007.

                                s/Ethan R. Dettling
                                OF COUNSEL